In re **CANTONWOOD ASSOCIATES LIMITED PARTNERSHIP, d/b/a Cantonwood Investment Trust, d/b/a Westwood Business Centre, Debtor.**

**Bankruptcy No. 91–14167–JNG.**

United States Bankruptcy Court,
D. Massachusetts.

April 13, 1992.

Jacob Aaron Esher, Rubin and Rudman, Boston, Mass., for debtor.

James F. Wallack, Goulston & Storrs, P.C., Boston, Mass., for movant.

## MEMORANDUM

JAMES A. GOODMAN, Chief Judge.

### I. Introduction

The matter before the Court is "Travelers Insurance Company's Motion for Order Dismissing the Case on Grounds that the Debtor is Unable to Effectuate a Plan and Directing Debtor to Pay to Travelers Funds in Escrow Account" (the "Motion"). At a hearing held on December 6, 1991 to consider this Motion, the Court directed Travelers Insurance Company ("Travelers") and the Debtor, in light of their stipulation as to the relevant facts and the recent Fifth Circuit ruling in *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir. 1991), *vacated in part per curiam, reh'g en banc denied*, 1992 WL 35878 (February 27, 1992),[1] to file memoranda with respect to the legal issues raised by the Debtor's plan of reorganization filed on September 20, 1991.

### II. Facts

The Debtor, Cantonwood Associates Limited Partnership, is a Massachusetts limited partnership formed pursuant to an Agreement and Certificate of Limited Partnership dated September 11, 1984, as amended in September, 1987, June, 1988, and January, 1989. The Debtor is the sole beneficiary of the Cantonwood Investment Trust, which is the owner of record of certain parcels of real estate located at 690 Canton Street, Westwood, Norfolk County, Massachusetts, known as the Westwood Business Centre. Ranne P. Warner ("Warner"), John A.L. Wheeler ("Wheeler"), and Philip E. Anderson ("Anderson") are the Trustees of the Cantonwood Investment Trust (the "Trust"). The partners of the Debtor are Warner and Cantonwood Investment Corporation, both of which hold a 25% general partnership interest and a 25% limited partnership interest.

On or about June 27, 1987, Travelers made a loan to the Trust in the principal amount of $22 million, which loan is evidenced by a promissory note dated June 25, 1987, executed by the Trustees on behalf of the Trust in favor of Travelers. The loan is primarily a nonrecourse loan with certain customary exceptions. To secure the obligations of the Trust to Travelers, the Trust granted to Travelers a mortgage on the property located at 690 Canton Street and a security interest in the improvements, fixtures, and personalty, together with certain appurtenant and related rights and interests. In connection with the execution of the note and mortgage, the Trustees on behalf of the Trust also executed and delivered to Travelers an Assignment of Leases and Rents dated June 25, 1987. For purposes of the pending Motion, the Debtor does not dispute the validity, priority or perfection of Travelers' mortgage and security interest.

Pursuant to the June 25, 1987 note, the Trust was obligated to pay interest on the then unpaid principal amount of the note in sixty consecutive, monthly installments of

---

**1.** The Fifth Circuit opinion in *In re Greystone III Joint Venture* resolved a dispute between a debtor ("Greystone"), whose only significant asset was an office building in the troubled Austin, Texas real estate market, and Phoenix Mutual Life Insurance Corporation ("Phoenix"), a lender who possessed a multi-million dollar lien against property which the debtor proposed to keep pursuant to a "cram down" plan. Although the bankruptcy court confirmed the debtor's plan, a decision upheld by the district court, the Court of Appeals reversed for two reasons, the rational for which is germane to the instant dispute:

> First, the Greystone plan impermissibly classified like creditors in different ways and manipulated classifications to obtain a favorable vote. Second, tenant security deposit holders were not properly deemed an "impaired" class under the circumstances of this plan. 948 F.2d at 136 [hereinafter *Greystone* ].

$171,875, in arrears, commencing on the first day of August 1987. The Trust was given the option of extending repayment for an additional period of up to five years.

The Trust did not make the full payments of interest that were due under the terms of the note on December 1, 1990 and on the first of each month in the following months, including May 1, 1991. On or about January 11, 1991, however, the Trustees and Travelers executed a document captioned "Pre Workout Agreement," which contemplated a final written agreement relative to all outstanding issues. No such final agreement was ever reached.

By letter dated May 7, 1991, Travelers declared the entire indebtedness under the note to be due and payable and demanded payment in full. Three days later, Travelers sued Warner, Wheeler and Anderson in Suffolk County Superior Court, seeking an order declaring that Travelers was entitled to take possession and to operate the property free and clear of interference by the Trustees. Travelers also sought injunctive relief against the Trustees to prevent them from interfering with Travelers' possession, management, leasing and operation of the property. On May 13, 1991, one day before the hearing scheduled on Travelers' motion for injunctive relief, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

As of the commencement of the case, the unpaid balance due on the note was approximately $22,760,000. As of May 1, 1991, the fair market value of the property was $13.2 million. Accordingly, Travelers, as an undersecured creditor, has a secured claim in the amount of $13.2 million and an unsecured, "deficiency" claim well in excess of $8 million. *See* 11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of the allowed claim.") The property also is encumbered by a second mortgage to Lincoln Trust Company ("Lincoln"), which secures a contingent obligation in the amount of $600,-000, and a third mortgage to Fleet National Bank ("Fleet"). The third mortgage allegedly secures two claims in the approximate amounts of $2 million and $4 million, respectively. In addition to Travelers, Lincoln and Fleet, the Debtor has scheduled 36 unsecured creditors whose claims total approximately $203,126.

The Debtor is the lessor under approximately seventeen leases covering approximately 140,000 square feet or 85% of the rentable area of the Canton Street property. The Debtor has a total of two employees who perform maintenance and security work, and it retains a management company by the name of Centros Management Corporation ("Centros"). Centros is a general partnership in which the general partners are Warner and Stratton Management Corporation, each of whom hold a 50% interest. The Debtor pays Centros a management fee of five percent of the base rents collected for the Westwood Business Centre each month (approximately $11,000 per month). Travelers does not object to the quality of maintenance at the Canton Street property. Moreover, in letters addressed to Centros or the Trust, Travelers approved all leases and lease renewals on and after September 1990, although it did not participate in negotiating the leases or the lease renewals. Prior to December 1990 when McDonald's Corporation of America's lease was renegotiated to market rents, payments to Travelers were current.

### III. Procedural Posture

On May 16, 1991, the Debtor filed a "Motion for Order Directing Payment of Rents to Debtor and Authorizing Use of Rents." On May 30, 1991, in a bench ruling, Judge Gabriel allowed the Debtor's motion in part, subject to an adequate protection order providing for the placement of all rents in excess of the amount required to operate and maintain the property in a separate escrow account.

On May 21, 1991, Travelers filed a "Motion for Relief from Stay, or, in the Alternative, to Dismiss." Following preliminary and evidentiary hearings at which Judge Gabriel expressed skepticism about the Debtor's ability to reorganize, Judge Gabriel, on July 24, 1991, denied the motion without prejudice and directed the Debtor to file a plan and disclosure statement on or before September 20, 1991. Travelers filed the instant Motion in response to the Debtor's proposed plan filed on September 20, 1991.

### IV. Statutory Framework

■ In order for a plan of reorganization to be confirmed, it must meet the requirements set forth in section 1129(a) of the Bankruptcy Code. Subsection 1129(a)(8), in particular, provides that

[w]ith respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

11 U.S.C. § 1129(a)(8). If all the other requirements of section 1129(a) have been met, except section 1129(a)(8), the plan may still be confirmed under the so-called "cram down" provisions of section 1129(b). Stated another way, "[a] plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one-half in number of each impaired class, 11 U.S.C. § 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation not withstanding the plan's rejection by one or more impaired classes." Greystone, 948 F.2d at 138. In a cram down, a plan can be confirmed over the objection of one or more impaired classes of claims or interests only if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to impaired classes that have not accepted the plan. Thus, the requirement of approval by at least one impaired class and the "fair and equitable" standard implicate the propriety of the Debtor's proposed classifica-

tion scheme and the plan's compliance with the absolute priority rule, two issues of moment raised by Travelers' Motion to Dismiss as will soon become apparent.

### V. The Plan

Pursuant to the plan filed on September 20, 1991, the Debtor proposes to pay Travelers' secured claim in full out of rental income from the property or a sale or refinancing of the property on or before the ninth year following confirmation. Based upon projections of net cash flow and sale proceeds, the Debtor proposes to pay a dividend of at least 35% to other unsecured and undersecured creditors from the net cash flow, or sale or refinancing proceeds, in excess of that required to satisfy and service Travelers' secured claim. The plan also provides that until all claims are paid in full, the existing equity interests will receive no property or distributions. Additionally, the plan provides for the assumption of the management contract with Centros, although Centros can be replaced by another management company by the affirmative vote of at least two-thirds in amount and one-half in number of the allowed claims of each class of creditors.

Specifically, the Debtor's plan contains nine classes as follows:

Class 1—Administration Expenses and Priority Claims

Class 2—Priority Tax Claims

Class 3—Secured Claims

Class 4—Trade Creditors Claims

Class 5—Deficiency Claims

Class 6—Lincoln Trust Company Claim

Class 7—Claims of Tenants Secured by Rights of Setoff

Class 8—Fleet Guaranty Claim

Class 9—All Partnership Interests of the Debtor

Class 8, the guaranty claim of Fleet in the amount of $4 million plus interest, is based upon a contingent liability arising from a guaranty which the Debtor executed in favor of Fleet to secure certain obligations of an entity known as 176 Federal Street Realty Limited Partnership.

Some of the Debtor's partners hold an interest in that partnership. The Debtor is investigating a contention by Travelers that the guaranty, which is secured by a mortgage on the Cantonwood property, is a fraudulent conveyance. However, given the value of property and the amount of Travelers' first mortgage, Fleet's Class 8 claim, if valid, is merely an unsecured claim.

The tenants' claims for security deposits are placed in a separate class—Class 7. The tenants, pursuant to the Debtor's proposed plan, are given the right to setoff the amounts of their security deposits, without interest, against the rent reserved under their leases for the last month of their tenancy. The Debtor maintains that the tenants' rights are altered under the plan and their claims are impaired. Notably, the Debtor has neither assumed nor rejected the tenants' leases.

Lincoln's Class 6 claim is based upon its issuance of a letter of credit for the account of the Debtor in the amount of $600,-000. The Class 6 claim is contingent at this time. The Debtor proposes to pay the claim only in the event the claim materializes which may result in Lincoln receiving a lesser percentage distribution than other claims in classes 4, 5 and 8. The Court notes, parenthetically, that Lincoln's claim was filed 30 days after the claims bar date.

Class 5 is comprised of Travelers' $8.76 million deficiency claim afforded by § 1111(b), despite the nonrecourse nature of its debt, and Fleet's $2 million deficiency claim. Like the claims of trade creditors in Class 4, which total approximately $200,-000, the Class 5, 6, 7 and 8 claims are all unsecured.

## VI. Classification Issues

■ Travelers argues that the Debtor's plan cannot be confirmed because, among other deficiencies, it improperly classifies creditors.[2] Citing *Greystone*, Travelers urges the Court to rule, as the court did in *Greystone*, that "[t]he Code has eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims." 948 F.2d at 139–40. Moreover, Travelers maintains that all the deficiency claims in the case arise from nonrecourse loans secured by liens against the property. Accordingly, Travelers notes that if the unsecured claims were properly classified in a single class, the Debtor could not possibly obtain the requisite acceptance of an impaired class since it holds over 60% of the total amount of unsecured claims. *See* 11 U.S.C. § 1126(c).

In *Greystone*, the United States Court of Appeals for the Fifth Circuit enunciated "one clear rule" with respect to the classification of claims: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone*, 948 F.2d at 139. *See also In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir.1986) ("Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.") Travelers observes that this rule is implicated here since the Debtor needs the acceptance of at least one impaired class of claims in order to "cram down" the secured and unsecured portions of Travelers claim, and Travelers has indicated that it intends to vote against the Debtor's proposed plan. *See* 11 U.S.C. §§ 1129(a)(8), 1129(a)(10) and 1129(b)(1). Thus, the issue before the Court is whether the Debtor's classification scheme is justified under the facts and the law or whether it is a thinly disguised attempt to obtain an affirmative vote of an impaired class in

---

**2.** Section 1122 of the Bankruptcy Code governs classification of claims and interests. It provides:

 (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

 (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
11 U.S.C. § 1122.

order to invoke the "cram down" provisions of 11 U.S.C. § 1129(b)(1).

As Judge Queenan recently noted in *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991), "[t]he controlling authority on claim classification in this circuit is *In re Granada Wines, Inc.*, 748 F.2d 42 (1st Cir.1984)." 134 B.R.at 1002. In dicta, the Court of Appeals for the First Circuit stated: "[t]he general rule regarding classification is that all creditors of equal rank with claims against the same property shall be placed in the same class." 748 F.2d at 46 (citation omitted). In *Bjolmes*, the Court determined that the secured creditors' right to make an election under § 1111(b)(2), namely "the right to treat the entire amount of its allowed claim as a secured claim even though this amount exceeds the value of the mortgage interest ... is the type of dichotomy referred to in *Granada Wines*—a difference in rank with respect to property." 134 B.R. at 1003. To buttress its determination that the *potential* for a difference in legal rank justifies separate classification, the court addressed practical considerations motivating undersecured creditors and trade creditors. The court noted undersecured creditors, such as Travelers, have incentive to vote against cram down plans in order to enhance their chances of obtaining relief from the automatic stay, while trade creditors have every incentive to vote in favor of such plans since they are likely to receive little if anything upon liquidation of the debtor's other assets.

While not mentioning the *Bjolmes* decision, the Debtor's position is consistent with it. The Debtor argues that the Fifth Circuit in *Greystone* erroneously restricted the application of what it says is the majority rule allowing flexible classification of claims by eliminating the debtor's right to separately classify the Code-created deficiency claim of the secured lender based upon its nonrecourse status under state law. *See* 11 U.S.C. § 1111(b). *See also Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310 (8th Cir.1987); *Matter of Jersey City Medical Center*, 817 F.2d 1055 (3d Cir.1987); *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986). The

Debtor further argues that the *Greystone* decision disenfranchises legitimate creditors, negates the debtor's bargaining powers and destroys the incentive to negotiate.

The Debtor's views are predicated in part upon its analysis of the legislative history of 11 U.S.C. § 1111(b), an analysis which it maintains reveals that Congress "clearly intended" that the changes in §§ 1129 and 1111(b) be the only protection afforded undersecured creditors, without the additional protections afforded them by judicial fiat through the creation of restrictions on the normal flexible classification rule. The Debtor's position is the same as that advanced by the court in *In re Triple R Holdings, L.P.*, 134 B.R. 382 (Bankr. N.D.Cal.1992). In that case, the court confronted the issue of whether the new value exception to the absolute priority rule remains "an open path to reorganization." 134 B.R. at 384. The court discussed the *Greystone* opinion and, while not rejecting the outcome, it criticized the Fifth Circuit's pervasive assumption that Chapter 11 embodies the principle of creditor control. Specifically, the California court stated:

> In many cases, the debtor's offer to general unsecured creditors is better than that offered by the undersecured creditor. The Fifth Circuit's rationale in *Greystone* would eliminate negotiation between the parties and grant the undersecured creditor a blocking ballot by virtue of its deficiency claim. this veto power would enable an undersecured creditor to remove an important asset from the estate and eliminate the possibility of recovery by general unsecured creditors and equity interests. The result goes beyond general principles of creditor control to preferred treatment.

134 B.R. at 386 (footnote omitted). Without addressing the classification issue directly, the court concluded from its review of the House and Senate versions of legislation involving the "write down" of mortgages in single-asset cases that section 1111(b) should not be interpreted to give undersecured creditors a blocking vote or veto power. 134 B.R. at 389.

Clearly, the California court was implying what Judge Queenan expressed in *Bjolmes:* the right to make an election under section 1111(b) justifies separate classification of deficiency claims from other unsecured claims. Without this implication, the California court's decision with respect to the new value exception to the absolute priority rule, while appealing to some from a policy point of view, makes no sense factually since in the vast majority of single asset cases where separate classification of deficiency and trade claims is not permitted, *numbers,* not policy, dictate the outcome, as the undersecured creditor usually will hold at least two-thirds of the amount of the claims in the unsecured creditor class. As the court in *Greystone* stated:

> The bankruptcy court resorted to policy considerations because it believed Congress did not foresee the potential impact of an electing creditor's deficiency claim on the debtor's aspiration to cramdown a plan. We disagree with this approach for three reasons. First, it results here in violating § 1122, by gerrymandering the plan vote, for the sake of allegedly effectuating a § 1129(b) cramdown. "Policy" considerations do not justify preferring one section of the Code, much less elevating its implicit "policies" over other sections, where the statutory language draws no such distinctions. Second, as shown, it virtually eliminates the § 1111(b) election for secured creditors in this type of case. Third, the bankruptcy court's concern for the viability of cramdown plans is overstated. If Phoenix's unsecured claim were lower and the trade debt were higher, or if there were other impaired classes that favored the plan, a cramdown plan would be more realistic. That Greystone's cramdown plan may not succeed on the facts before us does not disprove the utility of the cramdown provision. The state law distinction between Code-created unsecured deficiency claims and other unsecured claims does not alone warrant separate classification.

948 F.2d at 140. This Court agrees with the *Greystone* decision.

■ Having adopted the *Greystone* standard, the Court must consider the Debtor's overall classification scheme. Specifically, the Debtor suggests that the separate classification of the claims of Fleet and Lincoln is not only appropriate but mandatory. Relying upon *In re Planes, Inc.*, 48 B.R. 698 (Bankr.N.D.Ga.1985), the Debtor reasons that the contingent nature of both Fleet's and Lincoln's claims makes them completely dissimilar to any other claim.

A close reading of *In re Planes, Inc.* fails to support the Debtor's position. In that case, the court adopted the view that section 1122 " 'does not require that similar claims *must* be grouped together, but merely that any group created must be homogenous.' Therefore, the existence of several classes of unsecured claims in the case *sub judice* does not provide a sufficient basis for rejecting the Plan without further inquiry." 48 B.R. at 70. Referring to 11 U.S.C. 502(c) and citing *inter alia In re McCall*, 44 B.R. 242, 244 (E.D.Pa.1984), the Georgia court noted that "[t]he requirement that the Court estimate contingent or unliquidated claims prior to confirmation is succinctly stated in several reported decisions." 48 B.R. at 702. However, the court went on to state that it agreed with the proposition set forth in *In re McCall* that under certain circumstances where a claim in a particular class could not be liquidated or estimated prior to confirmation, confirmation was possible so long as the plan proposed a specific means of satisfying the claim when its value became fixed. 48 B.R. at 702–703, *citing In re McCall*, 44 B.R. at 244. Nevertheless, the *Planes* court concluded that the debtor had made "no showing as to why the deficiency claims and other contingent claims could not have been estimated prior to formulating a plan and moving for its confirmation." 48 B.R. at 703. Thus, the court held the following:

> The combined effect of creating separate classifications for unsecured claims and failing to reduce all such claims to specific dollar amounts has been to distort the voting with respect to the Plan. Only after these claims have been estimated

can the Court determine precisely how voting might have been manipulated by the creation of multiple classifications of unsecured claims. Therefore, a necessary prerequisite to confirmation is the estimation of deficiency and other contingent, unliquidated claims.... Although the estimation process might be time consuming, the Court perceives the estimation of claims as the only route for determining whether the classes are properly drawn and assuring that all claims have been given the vote to which they are entitled.

*Id.*

Although the Court realizes that the Debtor was ordered to file a plan within four months of the petition date, the Court is not persuaded that the Debtor has made the showing required by the court in *In re Planes, Inc.* Stated another way, the Court does not have a sufficient factual basis to make a determination that the appropriate circumstances exist here to permit separate classification of the claims in Class 6 (Lincoln) and Class 8, (Fleet), particularly where Article XIII, paragraphs 13.2(f) and 13.3(b) of the plan provide for pro rata distribution of excess rental income or proceeds from the sale of the property to Classes 4, 5, 6 and 8. It is conceivable that the estimation of the Fleet and Lincoln claims could be accomplished quickly. Alternatively, the process might be protracted. Nevertheless, the Court, at this juncture, has not been provided with information necessary to make the threshold determination set forth in the case upon which the Debtor relies.

█ The class comprised of tenants allegedly secured with rights of setoff is suspect, as well. Although the tenants' claims may be impaired by the Debtor's plan, presumably since the tenants are not entitled to interest on their security deposits, the Court is doubtful whether the tenants in fact have claims at all against the bankruptcy estate. A review of the case docket reveals that the Debtor has neither moved to assume nor reject its leases with its tenants, although the Court notes that the Debtor's plan is alleged to constitute a motion to assume all pre-petition executory contracts and unexpired leases. The Fifth Circuit in *Greystone* succinctly stated the law as follows:

A debtor in Chapter 11 must either assume or reject its leases with third parties. 11 U.S.C. § 365. If the debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. *See Matter of Whitcomb & Keller Mortgage Co.,* 715 F.2d 375, 378–79 (7th Cir.1983); *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1352 (9th Cir.1983). Under the Code, only creditors are entitled to vote on a plan of reorganization. *See* 11 U.S.C. § 1126(c). A party to a lease is considered a "creditor" who is allowed to vote, 11 U.S.C. § 1126(c), only when the party has a claim against the estate that arises from rejection of a lease. *In re Perdido Motel Group, Inc.,* 101 B.R. 289, 293–94 (Bankr.N.D.Ala.1989). If, however, the debtor expressly assumes a lease, the lessee has no "claim" against the debtor under § 1126(a). *See* 11 U.S.C. §§ 365(g), 502(g). The rights created by assumption of the lease constitute a post-petition administrative claim under section 503(b)(1)(A) of the Code. *LJC Corp. v. Boyle,* 768 F.2d 1489, 1494 n. 6 (D.C.Cir.1985). The holder of such a claim is not entitled to vote on a plan of reorganization. 11 U.S.C. § 1126(a); *In re Distrigas Corp.,* 66 B.R. 382, 385–86 (Bankr.D.Mass.1986).

948 F.2d at 141–42. Thus, pursuant to the Debtor's plan, tenants, if they have claims at all, would have administrative claims and would not be entitled to vote on the plan. Consequently, the Debtor has failed to convince the Court that Class 7 is a proper class.

█ With respect to the separate classification of the deficiency and trade claims, Classes 5 and 4 respectively, the Debtor argues that not withstanding the legal impediments to separate classification of deficiency claims addressed above on pages 653–55 of this opinion, it is prepared to offer evidence as to good business reasons for separately classifying trade claims, the

holders of which retain the right to pursue the general partners of Cantonwood to satisfy their claims in full. In contrast to the situation in *Greystone,* where the Fifth Circuit determined that separate classification was improper because of an absence of evidence to make such a determination, the Debtor in its memorandum suggests that maintaining friendships between tenants and the cleaning and security providers is critical to the Debtor's first-class reputation. However, the Debtor does not suggest, and, in view of the economic woes engendered by the present recession, credibly cannot suggest, that there is a limited market for trade goods and services in Canton and neighboring communities, or that the Debtor would be unable to obtain any trade services. The Court is not persuaded that the reasons cited by the Debtor rise to the level of proof required by the *Greystone* court. Moreover, since the trade creditors have recourse against the Debtor's general partner, the Debtor's implicit suggestion that the trade creditors will cease to provide services at the Debtor's property, thereby eroding the first-class reputation of the Westwood Business Centre, is simply unbelievable.

 Thus, the Court finds that legally and factually the Debtor's classification scheme is improper, as creditors of equal rank have not been placed in the same class. Moreover, the Court respectfully disagrees with the decision in *In re Bjolmes Realty Trust,* 134 B.R. 1000 (Bankr.D.Mass.1991), holding that the undersecured creditors right to make an election under 11 U.S.C. § 1111(b) warrants separate classification. Accordingly, the plan proposed by the Debtor cannot be confirmed.

### VII. The Absolute Priority Rule

██ Travelers focuses particular attention on the absolute priority rule, which the Supreme Court has described as follows:
... [it] ... 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.' The rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be 'fair and equitable.' The rule has since gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections ... if it fails to comply with the absolute priority rule.

*Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (citations omitted). In *Ahlers,* the respondents proposed to retain an equity interest in their family farm although unsecured creditors would not be paid in full. The Court of Appeals for the Eighth Circuit, relying on *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), held that the absolute priority rule did not bar the debtors from retaining their equity interest in the farm if their "yearly contributions of labor, experience and expertise" contributed "money or money's worth to the reorganized enterprise." *See* 485 U.S. at 202, 108 S.Ct. at 966. The Supreme Court reversed, stating "we simply conclude that even if an "infusion-of-'money-or-money's-worth' " exception to the absolute priority rule has survived the enactment of § 1129, respondent's proposed contribution to the reorganization plan is inadequate to gain the benefit of the exception." *Id.* at n. 3. The Supreme Court also squarely rejected the debtor's alternative argument that the absolute priority rule has no application where the property which the junior interest holders wish to retain has no value to the senior unsecured creditors. The Supreme Court stated:
We join with the overwhelming consensus of authority which has rejected this "no value" theory. Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which the

creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever." *Northern Pacific R. Co. v. Boyd*, 228 U.S. [482] at 508, 33 S.Ct. [554] at 561 [57 L.Ed. 931 (1913)]. Indeed, even in a sole proprietorship, where "going concern" value may be minimal, there may still be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business. See *SEC v. Canandaigua Enterprises Corp.*, 339 F.2d 14, 21 (CA2 1964) (Friendly, J.). And while the Code itself does not define what "property" means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad. " '[P]roperty' includes both tangible and intangible property." See H.R.Rep. No. 95–595, at 413, U.S.Code Cong. & Admin.News 1978, at 6369.

*Id.* at 208, 108 S.Ct. at 969 (footnote omitted).

With respect to the absolute priority rule, the Debtor argues that it does not stand as a barrier to confirmation of the plan. The Debtor states that its plan satisfies the absolute priority rule for two reasons: 1) at any time during the term of the plan, a majority of the creditors can transfer management and control of the property from Centros to any other management company; and 2) the partners of the Debtor can receive no distributions or property until all creditors have been paid in full. Neither the Court nor Travelers is fooled by this peregrination. Despite the Debtor's argument to the contrary, the partners are retaining their interests in the Westwood Business Centre under the plan. Therefore, the Debtor's plan violates the absolute priority rule.

*VIII. Turnover of Funds in Escrow Account*

■ The final issues raised by Travelers' Motion are whether the rental income in the Escrow Account is Travelers' cash collateral, and, if so, whether those sums should be turned over to Travelers at this time. Both parties point to decisions in this case made by Judge Gabriel to support

their respective positions. The Debtor argues that the question is an open one. Assuming *arguendo* that this is in fact the case, the Court will resolve the matter now.

Pursuant to the terms of its note and the Debtor's admitted defaults, Travelers declared the entire indebtedness under the note due and payable and demanded immediate payment in full on May 7, 1991. Both Travelers' Assignment of Leases and Rents and its Mortgage with the Trust authorized Travelers to take possession of the property in the event of default. Specifically, the Assignment provides:

> Upon or at anytime after the occurrence of an Event of Default ... the Assignee ... may at its option ... either in person or by agent with or without bringing an action or proceeding ... take possession of the premises described in said leases or in the Mortgage and have, hold, manage, lease and operate the same on such terms and for such period of time as the Assignee may deem proper and, either with or without taking possession of said premises, in the name of the Assignor or in its own name as assignee, demand, sue for or otherwise collect and receive all rents, income and profits of said premises.... In the event the Assignee exercises the rights granted it in this paragraph lettered "B", the Assignor shall use its best efforts and due diligence to facilitate the Assignee's collection of said rents. Promptly upon the request of the Assignee following an Event of Default, the Assignor shall execute and deliver a written notice to each and every tenant directing the tenant to pay rent to the Assignee....

Accordingly, on May 7, 1991, just prior to the bankruptcy filing, Travelers alleges that it made entry upon the property and filed a certificate of entry with the Norfolk Registry of Deeds pursuant to M.G.L. ch. 244, § 2, certifying that it made open, peaceable and unopposed entry. Travelers also states that it gave notice to each of the tenants that rents should be paid to Travelers. The Debtor characterizes Travelers' actions as an "attempted entry" and as trespassing. However, it acknowledges

that Travelers sent letters to the tenants directing them to make future payments to Travelers and that Travelers initiated a lawsuit in the state court.

Recent decisions in this jurisdiction unequivocally support the conclusion that Travelers has a perfected security interest in the rents generated by the Cantonwood property. *Compare In re Milford Common J.V. Trust,* 117 B.R. 15 (Bankr. D.Mass.1990) (Massachusetts law requires an overt act by the assignee to take actual or constructive possession for it to be entitled to the rents); *In re Ashford Apartments Limited Partnership,* 132 B.R. 217, 219 (Bankr.D.Mass.1991) ("a mortgagee who enters the property and gives notice of that fact to tenants prior to the filing of that petition under the Bankruptcy Code has done all that is required to obtain an interest in rents entitled to protection under Sec. 363."); *In re Concord Mill Limited Partnership,* 136 B.R. 896 (Bankr. D.Mass.1992) (a security interest in rents is perfected when the assignee at least makes entry and gives notice to tenants that rents are to be paid to the assignee, and, if the assignor refuses to cooperate and cede possession, the assignee's possession need not be peaceable and exclusive) with *In re Prichard Plaza Associates Limited Partnership,* 84 B.R. 289 (Bankr.D.Mass.1988) (perfection of an interest in rents under a collateral assignment of leases requires peaceable and exclusive possession); *In re Ledgemere Land Corp.,* 116 B.R. 338 (Bankr.D.Mass.1990) (same). *Cf. In re Somero,* 122 B.R. 634, 638–39 (Bankr. D.Me.1991) (security interest in rents and profits is an agreement perfected under Maine law by a recording in the registry of deeds where the mortgage on the real property from which the rents are derived would be recorded); *In re Rancourt,* 123 B.R. 143, 148 (Bankr.D.N.H.1991) (post-petition rents subject to an assignment of rents and mortgage are cash collateral even where mortgagee was not in possession or had obtained the appointment of a receiver).

Thus, this Court holds that, with respect to all pre-petition leases and the rental proceeds attributable to them, Travelers has a perfected security interest in rental income from the Cantonwood property and such rental income is cash collateral pursuant to 11 U.S.C. §§ 363(a) and 552(b).

In a Supplemental Memorandum of Law in Support of Application for Compensation and Reimbursement of Expenses, the Debtor raises an issue as to whether Travelers' perfected security interest extends to post-petition rental income from new leases entered into post-petition. *Citing In re Cross Baking Co.,* 818 F.2d 1027 (1st Cir. 1987), the Debtor argues that, although Travelers' security interest may extend to the proceeds of pre-petition leases, it does not extend to post-filing leases, which it describes as after acquired property not itself proceeds of pre-petition property.[3] The Court lacks the benefit of Travelers' legal arguments on this point, as well as specific information as to the number of post-petition leases and the dollar amount of rents attributable to them. Accordingly, the Court will defer the dismissal of this case and the entry of an order requiring the turnover of escrowed sums until such time as it can conduct a hearing with respect to this remaining, very limited, legal issue, as well as the allowance of administrative expenses, including attorneys fees.

## IX. Conclusion

Because the Debtor's proposed plan violates the absolute priority rule and

---

3. The Assignment of Leases provides in pertinent part:

[T]he Assignor, for good and valuable consideration, receipt whereof is hereby acknowledged, hereby absolutely sells, transfers, assigns and sets over to the Assignee, as additional collateral security, the entire Landlord's interest in, to and under those lease agreements (the "Existing Leases") identified in Exhibit A and made a part hereof, and all other leases which, from time to time during the term of this Assignment, shall be entered into by the Assignor with reference to the property covered by the Mortgage ... together with all rents, revenues, income and profits arising from said leases and any renewals and/or extensions thereof, and together with all rents, revenues, income and profits for the use and occupation of the premises described in said leases or in said Mortgage.

improperly classifies creditors, it cannot be confirmed. Moreover, the Court is not persuaded that additional time will enable the Debtor to propose an alternative plan that could cure the present deficiencies and be acceptable to Travelers. Therefore, the Court will allow Traveler's Motion to Dismiss, which is predicated upon 11 U.S.C. § 1112(b)(2) ("... the court ... may dismiss a case under this chapter ... for cause, including ... inability to effectuate a plan...."), subject to the resolution of the outstanding legal issue identified in section VIII above. The adequate protection order of May 30, 1991, except as modified below, pursuant to which the Debtor is required to deposit excess rental income into an escrow account shall continue in full force and effect. The Debtor shall immediately turnover rental income in escrow attributable to all leases in existence on the date of the filing and file, within 10 business days, an accounting of sums attributable to both pre- and post-petition leases.

The foregoing constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.