**In re GATO REALTY TRUST CORP., Debtor.**

**Bankruptcy No. 94–42711.**

United States Bankruptcy Court, D. Massachusetts.

June 8, 1995.

**16**

Charles R. Bennett, Jr., Boston, MA, for Lawrence Savings Bank.

Bruce F. Smith, Boston, MA, for debtor.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

### I. INTRODUCTION

Before the Court for determination is a "Motion for Determination of Classification" (the "Classification Motion") filed by Lawrence Savings Bank (the "Bank"). Through its motion, the Bank seeks a determination that the classification of its claim as provided in an amended Plan of Reorganization filed by the debtor Gato Realty Corporation, d/b/a Gato Realty Trust (the "Debtor" or "Gato") is violative of 11 U.S.C. § 1122(a), is discriminatory and constitutes an improper gerrymandering of claims for voting purposes. After hearing, the Court took the motion under advisement.

### II. FACTS

On June 15, 1994, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court. In its schedules, the Debtor lists the Bank as a creditor holding a secured claim in the approximate

amount of $2,768,012.55, and an unsecured deficiency claim in the approximate amount of $1,900,043.68. The Bank's claim is secured by real property located at 71 Glenn Street, Lawrence, Massachusetts (the "Property"). The Debtor asserts that value of the Property is approximately $1,000,000. The Bank asserts the value to be $1,700,000. Therefore, while the Bank and the Debtor disagree on the value of the property, they agree that the Bank is the holder of both a secured claim and a substantial unsecured deficiency claim. *See* 11 U.S.C. § 506(a).

The Debtor filed its first Disclosure Statement and Plan of Reorganization on November 30, 1994, and the Court scheduled a hearing on the adequacy of the Disclosure Statement for January 17, 1995. In response to comments from the Bank and the United States Trustee, the Debtor moved for a continuance of the hearing and filed a First Amended Disclosure Statement and Plan of Reorganization on March 2, 1995 (the "Amended Plan").

Through its Amended Plan, the Debtor set forth the following classes of claims and interests: Class "A" (Priority claims); Class "B" (Bank's secured claim); Class "C" (General unsecured claims) (estimated by the Debtor at $1,071,000); Class "D" (Bank's deficiency claim) (estimated by the Debtor at $1,600,000); and Class "E" (Equity shareholder interests).

Pursuant to the terms of the Amended Plan, the Debtor would pay, when due, allowed Class "A" claims incurred in the ordinary course of business. All other allowed Class "A" claims would be paid either on the Effective Date of the Amended Plan or in accordance with any agreement for waiver made between the holders of such claims and the Debtor. The Debtor proposed to pay the allowed secured claim of the Bank (Class "B") over a period of five (5) years, employing a twenty-five (25) year amortization and a balloon payment after five (5) years. The Amended Plan went on to provide that if the Bank elected under § 1111(b) to retain the full amount of its secured claim, the resulting payment obligation of the Debtor would be

amortized over a twenty-one (21) year period. In the event that the Bank did not exercise the § 1111(b) election, the Bank's deficiency claim (Class "D") would be classified separately from the claims of general unsecured creditors (Class "C"), but both classes would receive the same treatment—a pro-rata distribution of the funds of the Debtor on hand as of the Effective Date (inclusive of new value contributions by the equity security holders), and net of Class A Claims paid on the Effective Date.[1] Finally, the Plan provided that Class "E" claimants would receive nothing under the Plan unless they contributed new value. However the contribution was proposed to be $150,000, with new shares issued to the contributing shareholders.

On March 21, 1995, ten (10) days prior to the hearing on the Bank's Motion, the Court held a hearing on the adequacy of the First Amended Disclosure Statement. At the hearing, the Debtor withdrew its First Amended Disclosure Statement and Plan of Reorganization and the Court entered the following order:

> Second Amended Disclosure Statement to be filed by 4/7/95 and will be allowed without further hearing if accompanied by a statement of no objection by the United States Trustee or Lawrence Savings Bank (other than with respect to classification). The deadline for an election by Lawrence Savings Bank under 11 U.S.C. § 1111(b) is

extended, if necessary, to 4/7/95 at 4:00 p.m.[2]

Prior to the hearing on the adequacy of the First Amended Disclosure Statement, the Bank filed the Classification Motion. Through the motion, the Bank seeks a determination that the Debtor's proposed separate classification of the Bank's undersecured deficiency claim from the claims of general unsecured creditors is improper. The Bank reminds the Court that the majority of the Circuit Courts who have considered this issue, as well as a majority of the bankruptcy judges in this District, have found that the separate classification of a deficiency claim is improper. The Bank also argues that the Court should not permit separate classification because the Debtor has not offered a legitimate business reason for separate classification of the Bank's claim.

The Debtor urges the Court to follow the decision in this District of *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass. 1991) and the recent Seventh Circuit decision, *Matter of Woodbrook Associates*, 19 F.3d 312 (7th Cir.1994). The Debtor argues that each of those decisions properly recognizes that the significant differences between the legal rights of the holder of a deficiency claim and those of the holder of a general unsecured claim justify separate classification. The Debtor also argues that the 1994 amendments to the Bankruptcy Code,[3] which gave explicit recognition to single assets cases, implicitly approve of the separate clas-

---

1. The Plan would be partially funded from net rental payments ($13,000 monthly) accruing since the commencement of the case. In the Debtor's Second Amended Disclosure Statement, the Debtor projected that, as of May 1995, there would be approximately $129,000 in escrow on account of said rents and that approximately $94,000 of said fund would be available for distribution to creditors. (This Court's previous order that $13,000 of said fund be released to fund interim compensation awarded to Debtor's counsel was appealed by the Bank and stayed by this Court, by agreement of the parties, pending appeal.)

2. After obtaining court approval for an extension, the Debtor filed a Second Amended Disclosure Statement and Plan of Reorganization on May 1, 1995. The Plan was amended as follows: First, the Second Amended Plan creates an additional class of unsecured creditors (now designated as

Class "D") with claims under $4,000. Class "D" claimants (holding total claims of approximately $8,000), may elect to receive 90% of their allowed claim in a single cash payment. Second, the Second Amended Plan provides that if the Bank makes an election pursuant to § 1111(b), the amortization period for payment of its claim is reduced from twenty-one (21) years to nineteen (19) years and six (6) months. Third, if the Bank does not exercise its election under § 1111(b), its deficiency claim is now redesignated as Class "E". Fourth, equity shareholder interests (redesignated as Class "F") continue to receive nothing under the plan unless they contribute new value. However, the contemplated cash infusion is reduced to approximately $80,000.

3. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, §§ 218(a)–(b), 108 Stat. 4106, 4128 (1994).

sification of a deficiency claim.[4]

At the hearing on March 31, 1995, the Court stated that it intended to follow the *Bjolmes* decision. The Court took the matter under advisement and informed the parties that it would issue a written decision, without prejudice to the appellate rights of the Bank (i.e., that a subsequent election by the Bank, pursuant to § 1111(b) would not be deemed by this Court to moot or constitute a waiver of the Bank's arguments).

The Bank filed an election, pursuant to § 1111(b)(2), on April 6, 1995.

## III. DISCUSSION

Classification of claims and interests plays a central role in the formation and confirmation of a Chapter 11 plan. The Bankruptcy Code requires that a Chapter 11 plan shall designate, subject to § 1122, classes of claims and interests. 11 U.S.C. § 1123(a)(1). Each such impaired class must separately vote on whether to accept a debtor's plan of reorganization. 11 U.S.C. § 1129(a)(8). And a class has accepted a plan only if the holders of claims in the class have accepted the plan by at least two thirds in amount and more than one half in number of the allowed claims of the class. 11 U.S.C. § 1126(c).

■ There are two roads to confirmation based on the voting requirements set forth in the Bankruptcy Code. A plan may be confirmed if each class of impaired claims or interests accepts the plan, 11 U.S.C. § 1129(a)(8). Alternatively, a plan may be confirmed if at least one class of claims that is impaired under the plan accepts the plan, 11 U.S.C. § 1129(a)(10) and the debtor can also satisfy the so-called "cram down" provisions under § 1129(b).

■ Section 1129(b)(1) provides:
[T]he court, on request of the proponent of the plan, shall confirm the plan notwithstanding the [requirement that all impaired classes of creditors accept the plan] ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). A plan may accordingly be confirmed over the objections of one or more classes of impaired creditors so long as the plan (1) satisfies all conditions for confirmation other than the requirement that all impaired classes accept the plan; (2) does not discriminate unfairly; and (3) is fair and equitable with respect to the objecting impaired classes. 11 U.S.C. § 1129(b)(1). Therefore, where a debtor cannot obtain the assent of all impaired classes, it is critical that the debtor be able to properly isolate an impaired assenting class. Here lies the "rub". If the only otherwise assenting class is that of general unsecured creditors, and the deficiency claim of a secured creditor exceeds two thirds of the total of the deficiency claim and other unsecured creditors, an enforced combination of the two groups permits the secured creditor to control the combined class and prevent any confirmation not to the secured creditor's liking and irrespective of the fairness of its proposed treatment under the Plan.

■ The statutory provision governing the classification of claims or interests is set forth in § 1122:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122. While § 1122(a) provides that only substantially similar claims may be placed in the same class, the statute does not *expressly* require that all substantially similar claims be placed in a single class, nor does it expressly prohibit substantially similar claims from being classified separately. *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr.

---

**4.** The Court rejected this argument at the hearing because the Court found no basis for that inference in the said amendments.

S.D.Fla.1993); *Boston Post Road, Ltd. Partnership,* 21 F.3d 477, 481 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *see* J. Queenan, *Chapter 11 Theory and Practice: A Guide to Reorganization,* § 30.16 (1994) (The statute is not a model of draftsmanship.... What is far from clear is whether the plan must place all "substantially similar" claims into one class.) Moreover, the legislative history provides little guidance on the meaning of § 1122. The Senate Committee on the Judiciary stated:

> This section [1122] codifies current case law surrounding classification of claim and equity securities. It *requires* classification based on the nature of the claims or interests classified, and permits inclusion of claims or interests in a particular class only if the claim or interest being included is substantially similar to the other claims or interests of the class.

S.Rep. No. 989, 95th Cong., 2d Sess. 118, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5904. *See* J. Queenan, *Chapter 11 Theory and Practice: A Guide to Reorganization,* § 30.16 ([The] Committee reports, like the statute itself, expressly encompass only the requirement of homogeneity of claims placed within the same class.).

The ambiguity of § 1122 has generated numerous decisions addressing a debtor's ability to separately classify claims under a Chapter 11 plan of reorganization. This Court is bound by the First Circuit decision of *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 748 F.2d 42 (1st Cir.1984). In that case, the court ruled that the debtor's separate classification of a pension fund claim from other unsecured creditors was inappropriate as there was an insufficient basis for distinguishing the claims. The First Circuit announced the general principle that "all creditors of equal rank with claims against the same property should be placed in the same class." 748 F.2d at 46 (citations omitted). Furthermore, the court ruled that separate classification for unsecured creditors is justified only "where the legal character of their claims is such as to accord them a status different from the other unsecured creditors." *Id.* (citations omitted). The *Granada Wines* rule is among a genre of cases often referred to as the so-called "strict approach." *See In re Barney & Carey Co.,* 170 B.R. 17, 22 (Bankr.D.Mass.1994).[5]

The issue of separate classification of claims commonly appears in single asset real estate cases, such as the instant case. Pursuant to § 1111(b)[6], the secured creditor

---

**5.** Another approach is demonstrated by the case of *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir. 1987). In that case, the court upheld the debtor's separate classification of a union's damage claim (resulting from rejection of a collective bargaining agreement) from other unsecured creditors. While stating that there must be some limit on a debtor's ability to separately classify claims, the Sixth Circuit also emphasized the broad discretion of the bankruptcy court to determine proper classification according to the factual circumstances of the case. *Id.* at 586. The court determined that the union's "non-creditor" interest in rejection of the plan—that is, the union's interest in benefitting the ongoing employment relationship—put the union's claim in a different posture than other unsecured claims. *Id.* at 587. The court added that the anti-discrimination and fair and equitable requirements of "cram down" confirmation safeguarded the interests of dissenting creditors. *Id.*

**6.** Section 1111(b) provides:

> (1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the

debtor on account of such claim, whether or not such holder has such recourse, unless
> > (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
> > (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
> (B) A class of claims may not elect application of paragraph (2) of this subsection if
> > (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
> > (ii) the holder of a claim of such class had recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
> (2) If such election is made, then notwithstanding 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b).

Bankruptcy Rule 3014 governs the procedure for making an election under § 1111(b). It provides:

holding a deficiency claim may elect to treat its entire claim as secured "notwithstanding section 506(a)." 11 U.S.C. § 1111(b)(2). By making the § 1111(b) election, the secured creditor waives its deficiency claim and loses its right to vote in any class other than that of its allowed secured claim. By not making the election, the secured creditor chooses to treat its deficiency claim as unsecured and is entitled to vote that deficiency claim separately from its allowed secured claim. Whether the existence of the § 1111(b) election makes a deficiency claim sufficiently different from other general unsecured claims to justify separate classification is central to the classification debate.

A majority of courts have denied confirmation of plans that separately classify deficiency claims from other general unsecured claims. *See Boston Post Road, Ltd. Partnership*, 21 F.3d 477; *John Hancock Mut. Life Ins. Co. v. Rt. 37 Bus. Park Assocs.*, 987 F.2d 154 (3rd Cir.1993); *In re Lumber Exch. Bldg. Ltd. Partnership*, 968 F.2d 647 (8th Cir.1992); *In re Bryson Properties XVIII*, 961 F.2d 496 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991), as amended following reh'g en banc, 995 F.2d 1274 (5th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). The reasoning of the majority approach rejects the notion that § 1111(b) makes a deficiency claim different from other general unsecured claims, and rejects separate classification of unsecured claims solely to create an impaired assenting class. *See Boston Post Road, Ltd. Partnership*, 21 F.3d 477. This approach also been embraced by the majority of the bankruptcy judges in this district. *See In re*

*Barney & Carey Co.*, 170 B.R. 17; *In re Cranberry Hill Associates Ltd. Partnership*, 150 B.R. 289 (Bankr.D.Mass.1993); *In re Cantonwood Associates Ltd. Partnership*, 138 B.R. 648 (Bankr.D.Mass.1992); *In re L.G. Salem Ltd. Partnership*, 140 B.R. 932 (Bankr.D.Mass.1992).

A minority of courts have permitted separate classification of deficiency claims arising from *non-recourse loans*. Those courts have determined that there are significant disparities between the rights of claimants holding non-recourse loans and the rights of other general unsecured creditors. Those courts find the disparities primarily in the rights given by § 1111(b) to those otherwise non-recourse creditors that would be unavailable under a chapter other than Chapter 11. *E.g., Woodbrook Assocs.*, 19 F.3d at 318. *In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. 647 (Bankr.D.Kan. 1994); *In re SM 104 Ltd.*, 160 B.R. at 219–21.[7]

Divergent from other cases in the district, *Bjolmes* stands for the proposition that deficiency claims may be separately classified irrespective of their original character as recourse or non-recourse loans. 134 B.R. 1000. In the *Bjolmes* case, Bankruptcy Judge James F. Queenan, Jr. reasoned that the *right* to make the § 1111(b) election was itself a sufficient difference in the legal character of the deficiency claim to justify separate classification. He concluded that the disparity was "not a technicality without significant practical aspects", *id.* at 1003, and observed:

> A [secured party's] mortgage interest greatly influences the manner in which it will vote its unsecured claim. This became obvious at the hearing when the [secured

An election of application of § 1111(b)(2) of the Code by a class of secured creditors in a chapter 9 or 11 case may be made at any time prior to the conclusion of the hearing on the disclosure statement or within such later time at the court may fix. The election shall be in writing and signed unless made at the hearing on the disclosure statement. The election, if made by the majorities required by § 1111(b)(1)(A)(i), shall be binding on all members of the class with respect to the plan. Fed.R.Bankr.P. 3014.

**7.** In the *Barney & Carey* decision, Bankruptcy Judge Joan Feeney ruled that separate classifica-

tion of that *recourse* claim was improper, but reserved judgment in a case where a truly non-recourse claims was made recourse by operation of § 1111(b)(1)(A):

> If the loans that are the basis of a bifurcated secured claim were extended on a non-recourse basis, there might be a distinction between the legal nature of those claims and trade claims sufficient to support separate classification because the deficiency claim would not exist outside of Chapter 11.

170 B.R. at 24.

party] indicated that it would vote its claim against the plan in order to strengthen its case for terminating the automatic stay now preventing it from foreclosing on [the property]. Holders of trade claims would receive nothing from the foreclosure and little if anything from liquidation of the [d]ebtor's other assets, consisting primarily of equipment. Thus, they would likely vote in favor of the plan. The potential held by [the secured party's] unsecured claim for a difference in legal rank with the trade debt is therefore an indication of very real differences in these debts.

*Id.*

In a recent and scholarly Massachusetts bankruptcy decision, *Barney & Carey Co.,* Bankruptcy Judge Joan N. Feeney rejected the debtor's argument that a secured party's *right* to make an election under § 1111(b)(2) rendered the unsecured deficiency claims sufficiently distinct. *Id.* at 24. The court pointedly stated that "since the secured party elections were not exercised, the unsecured deficiency claims remain of the same legal priority as the general unsecured claims." 170 B.R. at 24. Therefore, while *Bjolmes* would find a distinction in legal character by examining the rights of a holder of a deficiency claim prior to its § 1111(b) election, *Barney & Carey* would focus instead on how the secured creditor chose to exercise those rights.

This Court is bound to apply *Granada Wines,* and therefore returns to the language of that decision for guidance. In *Granada Wines,* the claim sought to be separately classified was a claim for "withdrawal liability" under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381, et seq., Pub.L. No. 96–364, 94 Stat. 1208 (1980). The debtor in *Granada Wines* sought to separately classify the withdrawal liability claim on the grounds that the claim in Chapter 11 was allowable in the full amount, but under Chapter 7 would have been reduced by 50% pursuant to MPPA. The *Granada Wines* court rejected that distinction as a basis for separate classification, holding that the difference between the withdrawal liability claim and that of other unsecured creditors affected only the allowable

amount of the claim and not its legal nature. In so holding, *Granada Wines* chose to follow the "general rule regarding classification ... that ' "all creditors of equal rank with claims against the same property should be placed in the same class," ' " 748 F.2d at 46 (quoting *In re Los Angeles Land and Investments, Ltd.,* 282 F.Supp. 448, 453 (1968) *aff'd,* 447 F.2d 1366 (9th Cir.1971)) (citation omitted), and that "[s]eparate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord then a status different from the other unsecured creditors.' " *Id.* (citation omitted).

█ This Court believes that a deficiency claim, as impacted by § 1111(b), enjoys a rank, character and status different from the withdrawal liability claim considered in *Granada Wines.* While the *Granada Wines* withdrawal liability claim was distinct from other unsecured claims only in its allowable amount, the deficiency claim subject to § 1111(b) enjoys the right to assume a different rank, status and character than other unsecured creditors against property of the estate. Namely, the deficiency claim has the right of conversion from an unsecured claim to a nonrecourse secured claim. That right is not available to other unsecured creditors. Furthermore, this Court reads in *Granada Wines* court's adoption of the terms "character" and "status" rather than "priority" (while still rejecting the business justification approach), a broader examination of the legal rights of different unsecured claims. Otherwise, that court would not have suggested that *any* separate classification of unsecured claims was possible under any circumstances. On the contrary, Granada Wines explicitly provides that based on differences in "rank", "status" and "character", there can be separate classification of unsecured claims.

In view of this Court's reading of *Granada Wines* to permit the Court to examine more broadly the 'rank', 'legal character' and 'status' of a claim and in view of this Court's belief that § 1111(b) affords deficiency claims a different rank, character and status than other unsecured claims, this Court will follow the holding of *Bjolmes* that a deficiency claim may be classified separately from other unse-

cured claims. On a most basic level, this Court can not avoid the practical realization that the rights afforded to holders of deficiency claims are simply greater (and therefore different) from the rights given to other unsecured creditors. This difference in rights leads inevitably to a difference in interests. While the unsecured creditor looks to its treatment in the class of unsecured creditors as its economic reality under the proposed plan, the holder of the deficiency claim may exercise its vote in favor of what is best suited to protect the rights of its allowed secured claim in another class. And if the deficiency claim is combined with unsecured claims with no such other interests, the deficiency claim holder may choose to vote against the plan despite the harm that such a vote may do to the deficiency claim and unsecured claims in its class. The enforced combination of the deficiency claim and other unsecured claims therefore pairs claims in potential conflict.

Furthermore the *Woodbrook* and *SM 104 Ltd.* courts warn that the legal disparities between § 1111(b) claimants and general unsecured creditors could lead to anomalous results when other Bankruptcy Code provisions are implicated. Where the deficiency claim is non-recourse (and, therefore, unable to receive payment under Chapter 7), enforced classification with other general unsecured claims would grant the deficiency claim the power to block confirmation under § 1123(a)(4)[8] and § 1129(a)(7)(B)[9] unless it received payment of an amount equal to that of general unsecured creditors. *Id.* Furthermore, regardless of whether such deficiency claims are recourse or non-recourse, enforced classification of such claims with other unsecured claims would give general unsecured creditors the right to participate in the election process under § 1111(b)(1)(A) and, therefore, block approval on whether the § 1111(b) claimants should make the election. *Id.* The Seventh Circuit concluded that "[t]he drafters of the Bankruptcy Code did not intend these results." *Id.*

■ This Court respectfully disagrees with *Barney & Carey* that the examination of the rights of the parties should be undertaken after the § 1111(b) election is completed. The classification issue frequently arises before the deadline for exercising the election. *See* Fed.R.Bankr.P. 3014. Commonly, and particularly in the single asset real estate case, secured creditors seek dismissal of the case or the lifting of the automatic stay at the earliest stages of the case, claiming that because a projected deficiency claim can not be separately classified and the deficiency claim dwarfs the claims of other unsecured creditors, no confirmable Plan is possible. *See* 11 U.S.C. § 1112(b)(2); 11 U.S.C. § 362(d)(2)(B); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Therefore, the availability of separate classification may have to be determined long before the deadline for exercising the § 1111(b) election.

Finally, this court feels compelled to address the concern raised by many of the aforecited decisions that " 'artificial classification' ... not be used to 'gerrymander', that is for the purpose of creating one accepting impaired class to improperly manipulate the voting requirements of § 1129(a)(10)." *In re Barney & Carey Co.,* 170 B.R. at 24. Black's Law Dictionary defines the term "gerrymander" as follows:

8. Section 1123(a)(4) provides:
 Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall— ...
 (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest[.]
 11 U.S.C. § 1123(a)(4).

9. Section 1129(a)(7)(A) provides:
 With respect to each impaired class of claims or interests—

 (A) each holder of a claim or interest of such class—
 (i) has accepted the plan; or
 (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]
 11 U.S.C. § 1129(a)(7)(A).

A name given to the process of dividing a state or territory into the authorized civil or political divisions, but with such a geographical arrangement as to accomplish an ulterior or unlawful purpose, as, for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines.

*Black's Law Dictionary* 687 (6th ed. 1990).[10]

 This Court is unable to find an "unlawful purpose" in the act of separately classifying a claim holding rights greatly in excess of other unsecured creditors. Nor does this court find such a classification to be an improper manipulation. A far better example of manipulation can be found in the failure of a deficiency claim holder to exercise a § 1111(b) election, not because it desires the same treatment afforded unsecured creditors, but because it is certain that the combination of its deficiency claim with the claims of other unsecured creditors will be the death knell of the plan. The obvious drafting goal of every Chapter 11 debtor is to gain approval of a plan. A debtor's attempt to satisfy a requirement of confirmation, that is § 1129(a)(10), by separately classifying claims with decidedly different rights should not be the target of criticism.

## IV. CONCLUSION

Based on the foregoing, the Court finds that the Debtor's proposed classification of the Bank is permissible under § 1122. Accordingly, insofar as the Bank seeks a determination that the separate classification of its claim from the general unsecured creditors is impermissible, the Bank's Motion for Determination of Classification is denied.

10. The word was reportedly drawn from (i) the name of Elbridge Gerry, a former Vice President of the United States (1812–13), whose party (while he served as Governor of the Commonwealth of Massachusetts) redistricted the state and (ii) the word salamander, from the fancied resemblance of the map of Essex County, Massachusetts to this animal, after the redistricting. *The Random House Dictionary of the English Language* 801 (2d ed. 1987).