In re EBP, INC., dba Epic Steel, Debtor.

Bankruptcy No. 93–12399.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Sept. 20, 1994.

---

Steven S. Davis, Cleveland, OH, for debtor.

Bruce W. McClain, Westlake, OH, for creditors committee.

Stephen D. Hobt, Cleveland, OH, for Neff Fremont.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

EBP, Inc. (the Debtor), doing business as Epic Steel, is engaged in the business of producing structural, reinforcing and other steel products for multiple-family residential units and other commercial projects. The Debtor sought relief in this Court by filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code [11 U.S.C. 1101, *et seq.*]. Following the approval of its disclosure statement, the Debtor presently seeks confirmation of its proposed Plan of reorganization, as amended (the Plan). Upon a hearing on the matter, with due notice given to all entitled parties in interest, the following constitutes the Court's factual findings and conclusions of law.

As presented, the Plan consists of ten (10) classifications of claimants which are inclusive of the following: Administrative (Class I); Priority Tax Claims (Class II); Secured Claim of Neff Fremont on real estate (Class III); Secured Claim of Neff Fremont on equipment (Class IV); N. Fremont Truck Loan (Class V); Unsecured/Secured Claim of C. Czubaj (Class VI); Convenience Class (Class VII); Unsecured Trade Creditors (Class VIII); Penalty Claims (Class IX); and Equity Claims (Class X). Plan funding would come from a series of deposits to be made by the Debtor in accordance with Article V(C) of the Disclosure Statement. Purportedly, such deposited funds would be available from the Debtor's preconfirmation earnings, in addition to an infusion of capital addressed under Article V(B), Class 10.

As structured, Classes I and II are not impaired. Class III is impaired. Classes IV and V are not impaired. Class VI is impaired. Class VII is not impaired, while Class VIII, IX and X are impaired.

In determining whether or not the Plan is confirmable the Court must examine the Plan in view of the requirements under § 1129 of the Bankruptcy Code. Thereunder, the Debtor avers that each of the requirements elements has been satisfied and, as such, confirmation of the Plan is proper.

An objection to Plan confirmation was filed by the Official Creditors' Committee (the Committee). The Committee contends that: (1) the Plan fails to comply with Title 11 as required by § 1129(a)(1) of the Code; (2) the Plan was not proposed in good faith, in violation of § 1129(a)(3); (3) the Plan fails to adhere to § 1129(a)(5)(B) by failing to disclose compensation of an insider; (4) in violation of § 1129(a)(7), the Plan fails to meet the "best interest of creditors" test; and (5) each impaired class of creditors has not accepted the Plan.

Section 1129(a)(1) is the Committee's first area of concern. Specifically, the Committee alleges that the Plan, as structured, permits wrongful discrimination of treatment among similar claimants. In pertinent part, § 1129 provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

11 U.S.C. 1129(a)(1).

In support of that allegation, the Committee asserts that the Debtor violated the provisions of § 1123(a)(1) which requires that "... a plan shall designate, subject to § 1122 of this title, classes of claims ... and classes of interests." Section 1123(a)(4) requires that "... a plan shall—provide the same treatment for each class of claim or interest of a particular class, unless the holder of a particular class or interest agrees to a less favorable treatment of such particular claim or interest." The Committee further alleges that § 1122 is violated which provides:

Except as provided under subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such

claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. 1122(a).

In view of those statutory provisions, the Committee asserts that the Plan violates § 1129(a)(1) as it improperly and separately classifies one unsecured claimant, Catherine Czubaj (Class VI), from the Debtor's other unsecured claimants. In support of its position, the Committee cites to the Sixth Circuit's decision in *In re U.S. Truck,* 800 F.2d 581 (6th Cir.1986). Upon consideration, this particular prong of the objection is not well-founded, and the Committee's reliance upon *U.S. Truck* is clearly misplaced. As cited above, § 1122 is clear to allow separate classification of claims or interests where such are substantially dissimilar. In the present case, undisputedly, the Czubaj claim is a tort judgment claim while the balance of the Debtor's unsecured claims represent trade debt of claimants who continue to extend credit to the Debtor to sustain its business. Other than being unsecured, the similarity between the Czubaj claim and the remaining unsecured claimants stops there. The Czubaj judgment is a non-recurring judicial event, providing no continuing benefit to the Debtor's estate, whereas the trade creditors, while also unsecured, do provide a potential continuing benefit which will sustain the Debtor's business if confirmation is achieved. The converse is true from the Debtor's position. Also of significant note is the fact that the Czubaj claim is the single largest unsecured claim, representing approximately 70% of all the unsecured debt. This comparison provides the requisite dissimilarity to warrant a separate classification of the aforesaid claimants pursuant to § 1122(a) of the Code. Furthermore, the Sixth Circuit's decision in *U.S. Truck* is supportive of and is consistent with the above interpretation of § 1122(b):

Section 597 was interpreted to require all creditors of equal rank with claims against the same property to be placed in the same class.... *Congress' switch to less restrictive language in section 1122 of the Code seems to warrant a conclusion that Congress no longer intended to impose the now-omitted requirement that similar claims be classified together [citing] Mat-*

*ter of Huckabee Auto Co.,* 33 B.R. 132, 137 (Bankr.M.D.Ga.1981). Emphasis added). 800 F.2d 581, 585.

■ As occurred in *U.S. Truck,* the present Debtor simply utilized the classification powers afforded under § 1122 to segregate a dissenting impaired claimant (i.e., Czubaj) from assenting impaired claimants by placing the dissenter into a class by itself. Effectively, this assures that at least one class of impaired claimants will vote in favor of the Plan and make it eligible for cramdown consideration under § 1129(b). (*Id.* at 586). Such eligibility through separate classification, however, does not automatically result in an adoption of the Plan. The Committee's interests are still protected by the provisions of subsections § 1129(a) and (b), particularly the cramdown requirements of § 1129(b) that the Plan not discriminate unfairly and that it be fair and equitable to the other claimants. (*Id.* at 587). In brief, the Sixth Circuit allowed a separate classification of unsecured claimants on the same basis as the Debtor structured Classes VI and VIII. As in the present case, the principal basis for allowing the separate classification was that the two separate classes of unsecured creditors had a different stake in the future viability of the reorganized debtor and the unsecured trade creditors also possessed alternative means at their disposal for protecting their claims. Thusly, the Committee's reliance upon *U.S. Truck* is misplaced, and the Debtor's classification of claims is found to be proper.

■ The Committee further objects on the basis that the Plan was not proposed in good faith. For support, it argues that the Plan is more favored towards paying off an insider (Neff Fremont) undersecured claim (100%), while proposing to pay a lesser dividend to the largest unsecured claimant (Czubaj). It also argues that on the unsecured portion of Fremont's secured claim, the Plan proposes a payout of 58.6%, while Czubaj's unsecured claim would receive 51.8%. Further, the Committee asserts that the Plan proposes to pay this insider debt in full, while disregarding any potential impact of a related pending adversary proceeding concerning this debt. In brief, no contingency provision is ad-

dressed in the Plan respecting this debt, while the Plan interestingly, does provide a treatment on the Czubaj claim which is pending on appeal. This objection is well-founded as presented, and the Court so finds. It is sustained.

■ Next, the Committee asserts that the Plan, as structured fails to provide interest on contested claims, in the event such claims are ultimately allowed. As the Neff Fremont and Czubaj claims are the subject of pending litigation, and could, potentially, alter the solvency status of the Debtor upon adjudication, the Plan should address contingent interest on said claims to avoid a possible violation of § 726(a)(5). As such interest payments would be required under § 726(a)(5) where the Debtor is found to be solvent and sufficient property exists to pay the interest. This objection is well-taken and the Court so finds, as the absence of such interest payments contravenes § 726(a)(5) and thereby § 1129(a)(1) of the Code.

The Committee's assertion of a Plan violation of § 1129(a)(5)(B), failure to disclose compensation, was considered but is not well founded.

■ The Committee asserts that the Plan fails to meet the "best interest of creditors" test in violation of § 1129(a)(7).

Section 1129(a)(7) requires that:

With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).

In that respect, the Debtor has represented that the present value of the proposed plan payments to Class VI is 69% of her total claim and that she would receive 62.8% of her claim upon liquidation. Likewise, the present value of the proposed plan payments to Class VIII is 93% and that class would receive 62.8% in liquidation. Thus, the Debtor contends that § 1129(a)(7) has been met. This analysis requires scrutiny of both the discount rate used to compute the present value of the proposed plan payments and the liquidation analysis. The discount rate used by the Debtor to calculate the present value of the proposed plan payments was 4.93%, the discount rate for U.S. Treasury bills. (Kaminsky, Cross). The Debtor's expert, Thomas Kaminsky (Kaminsky), testified that the U.S. Treasury Bills are a more secured investment than a closely held business such as the Debtor. (Kaminsky, Cross). Yet, he opined that a prudent investor would invest in the Debtor at that rate. (Court XI).

The Committee's expert witness, Lawrence Murtaugh (Murtaugh) testified that the discount rate used to arrive at the present value of the proposed plan payments is too low. (Murtaugh; Direct). He testified that 7¾%, the prime rate, is a minimum and that a better comparison is high yield bonds such as 9⅜% to 14½%. (Id.). A prudent investor would not take a rate of 4.93% on investment in the Debtor. (Id.). On rebuttal, Kaminsky testified that high yield bond rates require a very long investment period without receiving a stream of income and, thus, are not an appropriate comparable for a proper discount rate. (Kaminsky, Rebuttal/Direct).

The testimony of both Kaminsky and Murtaugh was conclusory. The Court would have been greatly aided in its decision by hearing further testimony regarding the comparable rates. Such was not presented. The Court was not apprised of how long a "very long investment period" is with respect to high yield bonds. Nor was there clarification that the particular high yield bonds referred to do or do not provide an income stream to the investor other than Kaminsky's general statement that high yield bonds do not do so. Further testimony as to how much the proposed income stream/plan payments would affect each proposed discount rate was not forthcoming. Nor did the parties offer evidence regarding how lengthen-

ing or shortening the period for payments would affect the proposed discount rate.

Notwithstanding this lack of testimony, it is clear that a small closely held business is a more risky investment than an investment in the U.S. Government investment securities. Given this premise, it can fairly be assumed that a small closely held business in a pending Chapter 11 proceeding is even more risky than a small closely held business not in a Chapter 11 proceeding, thereby removing this Debtor even farther from U.S. Government securities with respect to comparable discount rates.

Secondly, review of Creditors' Committee Exhibit B, the September 1, 1994 Wall Street Journal, from which the comparable rates were taken, shows that the 4.93% rate for U.S. Treasury Bills is for a period of 26 weeks. The U.S. Treasury Bill rate for 13 weeks is 4.61%. This comparison, along with Kaminsky's testimony that the length of payment terms affects the discount rate, shows that a discount rate for a 26 week investment would not be a reasonable comparable discount rate for discounting a stream of payments that span a period in excess of 572 weeks (11 years), such as is proposed in the Debtor's Plan.

Thus, the discount rate for the present value of the payments to be made under the Debtor's proposed plan is clearly higher than 4.93%. Such higher discount rate correspondingly reduces the present value of the proposed plan payments. The Debtor has not met its burden of proof with respect to § 1129(a)(7). The objection is sustained.

■ As part of the Committee's § 1129(a)(7) objection, it attached the Debtor's liquidation analysis. The Debtor's contention that the liquidation analysis was approved as part of the disclosure statement is not well taken. Such a contention misconstrues the purpose of the disclosure statement versus plan confirmation. Pursuant to § 1125(a), the Debtor is required to provide, in a disclosure statement, adequate information that would enable a hypothetical reasonable investor typical of holders of claims of interest to make an informed judgment about the plan. 11 U.S.C. § 1125(a). Such adequate information requires that a liquidation analysis be provided. A liquidation analysis enables creditors to test the proposed plan to see if it meets the requirements of § 1129 and any other requirements personal to the creditor.

■ It is at plan confirmation that the plan is tested utilizing, among other things, the liquidation analysis. It is at plan confirmation that the plan does or does not live up to the requirements of § 1129. The Debtor bears the burden of proof in this respect. If its liquidation analysis does not support its contentions at this stage, its plan may not be confirmable. Thus, approval of a disclosure statement does not approve the figures contained in the liquidation analysis as those figures are more appropriately tested at plan confirmation. The principal purpose of the disclosure statement hearing is for the Court to determine if such statement contains adequate information.

■ The Committee's expert witness, Lawrence Murtaugh (Murtaugh), testified that the liquidation valuation performed by Kaminsky was acceptable, except for the accounts receivable and inventory analysis. Murtaugh would prefer to look at the collection history of receivables for five years and write offs to obtain a percentage to apply to the accounts receivable. (Murtaugh, Direct). Inventory valuation would require detailed analysis of each job and cost to complete the job by an outsider and deduct that cost from the completed job. (Id.). Kaminsky testified that he reviewed contingent liabilities, accounts receivable and the nature of the inventory. (Kaminsky; Cross). He testified that 10–20% of the Debtor's inventory was raw material and the rest was work in progress. (Id.). Thus, it appears that he met satisfactorily the criticisms made by the objectant's expert.

■ The Committee's expert did not offer a liquidation analysis. Rather, the Committee tried to offer a liquidation analysis prepared by the attorney for the creditors' committee, Bruce McClain (McClain). The Committee attempted to introduce such an analysis through Kaminsky. Kaminsky, however, did not agree with the analysis

presented by McClain and thus such was not viewed as substantial evidence.

Kaminsky also testified that the liquidation analysis was based upon a "fire sale" type liquidation rather than an "orderly liquidation" where the business continues to operate over time. (Kaminsky; Cross). There was no evidence submitted that such an assumption was inappropriate. The Committee's other expert witness, Charles P. Storey (Storey), offered testimony regarding stock valuation, not a liquidation analysis or valuation, and thus such testimony is not applicable to this point. The Debtor met its burden of proof with respect to the reasonableness of the liquidation analysis.

■ Although not part of its written objection, the Committee also objects to the Plan's proposal that the equity interests, Class X, may maintain their interests by jointly contributing $20,000.00 to the Debtor. The Committee maintains that the shares of stock are worth much more and that permitting the equity interests to retain their ownership of the Debtor when all creditors are not receiving full payment violates the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B)(ii). It is implicit in the objection that the proposed payment of $20,000.00 is insufficient to satisfy the new value exception to the absolute priority rule.

To substantiate the new value exception to the absolute priority rule, the Debtor submitted testimony from Kaminsky in support of the position that $20,000.00 was a fair value for the Debtor's shares. Kaminsky testified that the Debtor's shares of stock are worth $9,023.00. (Kaminsky, Direct; Court Ex. 2). He arrived at that figure by taking an average of three valuation methods; (1) the Capitalization of Earnings Method; (2) the Discounted Future Cash Flow Method; and (3) the Adjusted Net Asset Method. (Kaminsky, Direct).

The Committee submitted expert testimony from Storey. Storey testified that the Debtor's shares of stock are worth approximately $840,845.00. He arrived at that value by applying a multiplier to the operating cash flow. (Storey, Direct). Storey testified that he used a conservative multiplier after looking at construction companies in the Cleveland area. (*Id.*). Storey's opinion as to value of the shares of stock of the Debtor was based upon review of the monthly operating reports filed with the Court. (Storey, Direct). Upon cross-examination, however, he testified that he would not be willing to pay approximately $850,000.00 for the stock without further testing.

The Debtor met its burden of proof with respect to the new value exception to the absolute priority rule. The Committee's objection to the proposed treatment of Class X is unpersuasive and is overruled.

For the foregoing reasons, confirmation of the Debtor's First Amended Plan of Reorganization is denied. Accordingly, as directed on September 8, 1994, the Debtor is given until September 23, 1994 to submit a Second Amended Plan of Reorganization for the Court's consideration.

IT IS SO ORDERED.