**In re ECONOMY LODGING SYSTEMS, INC. and ELS Lodging, Inc., fka Knights Lodging, Inc., Debtors.**

Bankruptcy No. 94–14144.

United States Bankruptcy Court, N.D. Ohio.

March 6, 1997.

Harry W. Greenfield, Buckley King & Bluso, Cleveland, OH, and Michael D. Sirota, Cole, Schotz, Meisel, Forman & Leonard, P.A., Hackensack, NJ, for Debtor.

Bruce J.L. Lowe, Calfee, Halter & Griswold, Cleveland, OH, for Creditors Committee.

Bradley P. Nelson, Schopf & Weiss, Chicago, IL, for creditor, HMS Property Management Group Inc.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

On January 14 and 15, 1997, the Court heard argument and testimony on confirma-

tion of the Debtors' fourth amended plan of reorganization (the "Plan"). In 1995 the Debtors sold their Knights Inn franchise business for $15,000,000. Their remaining operating assets are three motels (the "ELS Motels") which a newly formed company (the "Reorganized Company"), owned by Gregory P. Temel, one of the Debtors' principals, proposes to purchase for $160,000. Mr. Temel is also a principal of Economy Realty Services, Inc. ("ERS"), which owns six motels (the "ERS Motels") encumbered by mortgages aggregating approximately $10,-000,000 (the "ERS Mortgages"). The Debtors are guarantors of $4,600,000 of this debt and comakers of the balance. The Plan provides that the Reorganized Company will be substituted for the Debtors as an obligor on the ERS Mortgages. The Reorganized Company will assume the mortgages aggregating $4,185,000 on the ELS Motels and the Debtors will be released from liability on those mortgages as well. There are, in addition, some cash adjustments to be made between the Debtors and the Reorganized Company.

Confirmation of the Plan would result in a pool of funds to be distributed to creditors once claim disputes are resolved. The major unresolved dispute involves HMS Property Management Group Inc.'s ("HMS") unsecured claim, which dwarfs the remaining unsecured claims of approximately $2,000,-000. If HMS's claim is denied, as the Debtors assert it should be, unsecured creditors would receive 80 to 90 percent of amounts owed them. If HMS's claim is allowed in full, creditors would receive about 25 percent of their claims. HMS's claim was allowed for purposes of voting on the Plan in class 13, which includes Debtors' other unsecured creditors, in the amount of $6,490,000. HMS, and therefore class 13, voted against the Plan and at the January hearing Debtors sought to "cram down" the Plan under 11 U.S.C. § 1129(b)(2)(B)(ii). The Plan was approved by all of Debtors' secured creditors as well as 22 of the 24 unsecured creditors who voted on the Plan. The unsecured creditors were represented by a creditors committee which has played a very active role in this case. The Plan was the result of negotiations between the Debtors and the creditors committee.

The parties had done substantial discovery and preparation for the confirmation hearing and had limited the issues in dispute to whether the Plan complied with applicable provisions of the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(1), whether it had been proposed in good faith as required by 11 U.S.C. § 1129(a)(3), whether it was in the best interest of creditors as required by 11 U.S.C. § 1129(a)(7)(A)(ii), and whether it could be crammed down under 11 U.S.C. § 1129(b)(2)(B)(ii). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

### Good Faith

HMS asserts that the Plan fails to comply with the Bankruptcy Code and has not been proposed in good faith because the Debtors' shareholders will receive distributions despite the fact that unsecured creditors will not be paid in full. Except to the extent that this contention is part of the cram down dispute, which is discussed subsequently, HMS bases its argument on the Court's approval on January 14 of a settlement of an administrative claim asserted by the shareholders on account of capital gains taxes incurred on the $15,000,000 franchise sale and passed through to the shareholders because the Debtors are Subchapter S corporations. The Court ruled that the payments to the shareholders contemplated by that settlement were properly made in respect of administrative claims and were not made on account of their interests in the Debtors for purposes of 11 U.S.C. § 1129(b)(2)(B)(ii). The Court's ruling in that regard is set forth at length in the transcript of the January 14 hearing and will not be repeated here. Based on that ruling, the Court overrules HMS's objections to the Plan under 11 U.S.C. §§ 1129(a)(1) and (3) based on the tax settlement.

### The Best Efforts Test

Under 11 U.S.C. § 1129(a)(7)(A)(ii) the Debtors have the burden of showing that

HMS would receive under the Plan not less than the amount it would receive if the Debtors were liquidated under chapter 7. HMS claims that the Debtors have failed to meet this burden because the Debtors' own liquidation analysis filed in its August 1996 disclosure statement shows that in a worst case liquidation scenario creditors would receive about 11 percent compared to about 5 percent under a worst case Plan scenario and because Debtors' liquidation analysis is based on unrealistic assumptions.

The most significant differences between Debtors' Plan and a chapter 7 liquidation would be the sale of the ELS Motels by a chapter 7 trustee rather than their sale to the Reorganized Company and the likely increase in costs stemming from delays, litigation, and adverse impact on the value of the ELS Motels if a consensual plan is not approved. The question is close, but the Court concludes that the Debtors have carried their burden on this point.

Appraisals of the ELS Motels show an aggregate market value of $6,100,000, but, in their August liquidation analysis, the Debtors assume that the ELS Motels would bring about $4,300,000 after selling expenses and a discount for a forced sale. This would result in a net recovery of $115,000 after payment of the mortgages on the ELS Motels. This discount is high. Everything else being equal, the only difference between a forced sale and an ordinary sale of the ELS Motels is the hurry-up nature of the former. However, the evidence and the history of this case strongly support the expectation that everything else would not be equal. The Debtors' principals have been tenacious in protecting their interests and could be expected to resist liquidation. Forced liquidation might also increase the Debtors' exposure to claims by the ERS mortgagees who would lose the benefit of the equity in the ELS Motels provided them in the Plan. Although it is impossible to quantify the costs and delays in transferring this case to a liquidation in chapter 7 and its adverse impact on realizing fair market value on the ELS Motels, the Court finds that on balance unsecured creditors will receive more under the Plan than in liquidation. The creditors committee's support for the Plan provides some comfort that this conclusion is correct.

### Cram Down and the New Value Exception

■ In light of class 13's rejection of the Plan, it may be confirmed only if the Reorganized Company "will not receive or retain under the plan on account of [Mr. Temel's interest in the Debtors] any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The Debtors have the burden of proving that the Plan does not violate this absolute priority rule.

Debtors attempted to meet this burden by qualifying the Reorganized Company's acquisition of the ELS Motels under the "new value or new contribution exception" to section 1129(b)(2)(B)(ii). The Court has chosen this latter phrase as the more apt description. This exception derives from *Case v. Los Angeles Lumber Products Co.*, where the Supreme Court stressed "the necessity, at times, of seeking new money essential to the success of the undertaking from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made." *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). Although the exception was born in dicta, its viability was questioned by the Supreme Court as recently as 1988, *see Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988), and the criteria for its application remain elusive and often obscure, most courts continue to invoke it to determine whether the debtor's owners may continue their participation even though unsecured creditors will not be paid in full.

The Sixth Circuit explicitly adopted the new contribution exception in *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581 (6th Cir.1986), and there is nothing in *Ahlers* to indicate a weakening of that commitment. The Ninth Circuit, after *Ahlers* was decided, adopted the new contribution exception in *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re*

*Bonner Mall Partnership)*, 2 F.3d 899, 907–08 (9th Cir., 1993). *U.S. Truck* and *Bonner Mall* reflect the view that the creditors' absolute priority can be appropriately vindicated without precluding the continued participation of former owners who alone may have the incentive and skill to make a reorganization succeed. *Bonner Mall*, 2 F.3d at 916.

A principal difficulty in applying the new contribution exception has been distinguishing the purchase of an interest by an equity holder's new contribution from use of the equity holder's control over the debtor to retain an existing interest. One court has suggested a prophylactic test in which old ownership can purchase a continuing interest only in an auction where third parties are allowed to bid. *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1010–11 (Bankr.D.Mass.1991). Although this procedure obviates concern that an owner may have obtained a continuing interest because of his leverage in the case and dramatizes the possibility of an owner acquiring an interest in the reorganized entity not attributable to his interest in the debtor, most courts have been content to look to the factors noted in *Case* to attempt to determine whether the owner's continued participation is consistent with creditors' absolute priority. The most widely accepted test requires the contribution to be new, in money or money's worth, substantial, necessary for the reorganization, and reasonably equivalent in value to the interest retained. *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 717–18 (Bankr.M.D.Tenn.1992).

■ Here the $160,000 is clearly new and in money or money's worth. The substantiality test is more problematic. $160,000 is a small percentage of the unsecured claims of more than $8,000,000, if HMS's claim is allowed. The Reorganized Company's assumption of the mortgages on the ELS Motels and Debtors' liability on the mortgages on the ERS Motels does not qualify as new for purposes of this test. The mortgage claims against the ELS Motels are fully secured according to the appraisals and any contingent claims against the Debtors appear substantially valueless. Although release of the Debtors' contingent liability on the ERS

Mortgages might benefit the Debtors' other creditors, the mortgagees' decision to relinquish their claims against the Debtors in favor of contingent claims against the Reorganized Company reflects the existing equity in the ELS Motels, not some new contribution by the Reorganized Company or Mr. Temel.

Nevertheless if $160,000 is fairly equivalent to the equity in the ELS Motels, its relatively small size would not disqualify it as new value under *U.S. Truck*. In *U.S. Truck* the Sixth Circuit approved a $100,000 contribution as adequate new value without comparing its size to the debtor's obligations. *U.S. Truck*, 800 F.2d at 588. Insofar as substantiality is a relevant test in this Circuit, it should be satisfied if the new contribution is more than of token size. In the context of this case $160,000 is more than a token. *See In re HRC Joint Venture*, 187 B.R. 202 (Bankr.S.D.Ohio 1995).

■ The question of whether the contribution is necessary is also problematic. The moneys are to be paid by the Reorganized Company to the Debtors for distribution to creditors. The payment has nothing to do with the operations of the ELS Motels or the business of the Reorganized Company. It appears from *Case* that the Court had in mind a situation where the shareholder contribution would be required to fund the reorganized debtor's operations. *Case*, 308 U.S. at 117, 60 S.Ct. at 8. Although a finding of such necessity provides a powerful incentive to find the new value sufficient, since otherwise no reorganization is possible, there is little indication that such necessity is a *sine qua non* in this Circuit. Although the district court in *U.S. Truck* found the $100,000 contribution necessary for the debtor's business, its finding was based only on testimony that the contribution was important. *U.S. Truck*, 800 F.2d at 588, n. 10. Moreover the Court in *Case* noted that the shareholders' contribution might be used to pay dissenting creditors. *Case*, 308 U.S. at 121, 60 S.Ct. at 10. Although Mr. Temel's cash contribution is a relatively small part of the distribution to be made to creditors in this case, it was apparently necessary to secure the Plan's approval by the creditors committee. This

appears to qualify the contribution as necessary provided that the Reorganized Company is, in effect, purchasing the ELS Motels at a price which satisfies the reasonably equivalent value test.

Debtors and their expert witness assert that for purposes of the reasonably equivalent value test the ELS Motels should be valued at $4,300,000, not $6,100,000, which the parties acknowledge is their fair market value. The $6,100,000 and $4,300,000 figures were computed by the appraiser on the basis of projected income from the ELS Motels using identical procedures and assumptions, except that the higher value assumes that $900,000 of improvements that the appraiser viewed necessary for the Motels to achieve their highest and best use will be made to them. The $6,100,000 figure contemplates that the improvements will be financed out of cash flow from the Motels; it is not an expense which a buyer would be required to assume in addition to the $6,100,000. If the improvements were made prior to sale, the Motels would have a fair market value of $7,000,000 not $6,100,000 according to the testimony of the appraiser, Mr. Powers.

Although Debtors' attempt to characterize the $4,300,000 figure as "reorganization value," there is no support for this characterization other than the fact that it would permit the Court to assign a net value of $115,000 to the Motels so that Mr. Temel's $160,000 payment would be well in excess of that value. "Reorganization value was devised in order to facilitate a finding of solvency and hence permit participation by stockholders making no fresh contribution." *Bjolmes Realty Trust,* 134 B.R. at 1010. No case has been cited which suggests that reorganization value would be less than fair market value. The only justification of doing so here would be to facilitate a reorganization sponsored by Mr. Temel. It is inconceivable that the Debtors would agree to sell the ELS Motels to a third party for $4,300,000 or that the $4,300,000 "appraisal" would be relevant to such a transaction. Therefore the inescapable conclusion appears to be that the Reorganized Company would receive most of the interest in the ELS Motels because of Mr. Temel's relationship to the Debtors, not because of

the $160,000 payment, unless the risk assumed by the Reorganized Company in assuming the ERS Mortgages can bridge the gap.

Confirmation of the Plan would remove a $10,000,000 legal liability from the Debtors' estate. The mortgagees of the ERS Motels have apparently agreed to relinquish their claims against the Debtors' in exchange for the Reorganized Company assuming that liability. To the extent that the ERS Motels are unable to service their mortgage debt and might be worth less than that debt, the Reorganized Company would presumably be responsible for the deficiency, which would, in effect, be a charge against the equity in the ELS Motels.

■ According to testimony proffered by Mr. Temel, he has appraisals of the ERS Motels showing a negative net worth, which may be as high as $3,000,000. However, the appraisals were not introduced in evidence. It also appears that the largest ERS mortgage is in default, although it appears that default is remediable, at least if the Plan were confirmed. The Debtors' expert accountant testified based upon his review of the Debtors' or ERS' appraisals and financial information, none of which was introduced into evidence, that the aggregate values of the ERS Motels exceeded $10,000,000 and that the cash flow from the Motels would cover expenses and debt service with an annual surplus of between $100,000 and $200,000, although he characterized this coverage as "tight" and said that the risk of liability to the Debtors (or the Reorganized Company) was "more than remote". The latter is a technical accounting term which indicates, if he is correct, that the ERS mortgage debt should be disclosed in a note to the Debtors' (or the Reorganized Company's) financial statements but is not sufficiently probable to book as a liability.

HMS's expert accountant testified as to the loan to value ratio of each specific ERS Motel and to the coverage of required interest payments, all of which were described as within normal limits, and suggested that the Reorganized Company's assumption of the ERS Mortgages posed little liability risk. His figures also were based on appraisals of

the ERS Motels and other financial information obtained from the Debtors, none of which, however, were introduced into evidence.

On the whole, the evidence provides little support for assigning $3,000,000 or other substantial value to the risk posed to the Debtors (or the Reorganized Company) by the ERS Mortgages. Prior to the confirmation hearing it does not appear that the Debtors showed all or any part of the ERS Mortgages as liabilities, whether in their liquidation analysis, financial statements, or elsewhere. The credibility of Debtors' argument is also weakened by the fact that it was presented by Debtors' expert simply as an adjunct to a valuation based on the Debtors' "reorganization value" appraisal and by the fact that the Debtors chose to present no appraisal or other evidence substantiating the risk other than Mr. Temel's conclusionary proffer.

Debtors also stressed that confirmation of the Plan would relieve the estate from continuing losses from the operation of the ELS Motels. Since the bulk of the losses were projected for January through March of 1997, the passage of time has rendered this point largely moot.

Therefore the Court is unable to fit these facts under *U.S. Truck* which relied heavily upon the risk that the shareholders' $100,000 contribution might be lost in concluding that that contribution was sufficient. *U.S. Truck* involved unusual facts where the parties' dispute focused more on their collective bargaining agreement than on payments under the reorganization plan, and the debtor's labor strife made any investment risky. *U.S. Truck*, 800 F.2d at 588. The court stressed that the Teamsters Committee, the objector, presented no independent evidence to support its objection and that the district court had concluded that the objection had been interposed for delay. *Id. See also* John D. Ayer, *Rethinking Absolute Priority After Ahlers*, 87 Mich.L.Rev. 963, 1017–18 (1989) (discussing *U.S. Truck* ).

After *Ahlers*, it appears that something more than the legal risk argued by Debtors must be shown to qualify as a new contribution or to reduce the value of the interest retained by the shareholders, as Debtors seek to do here. *Ahlers* echoes the rejection in *Case* of a contribution that "has no place in the asset column of the balance sheet of the new [entity]." *Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967–68. Here Debtors' own expert did not testify that all or any part of the ERS mortgage liability should appear in the liability column of the Debtors or the Reorganized Company.

This is not to second guess the judgment of the creditors committee or more than 90 percent of the unsecured creditors who voted for the Plan. Their focus was and should have been on maximizing their return, not on insisting on absolute priority where to do so might jeopardize that return. But the Supreme Court has made clear that the absolute priority rule cannot be abrogated by such utilitarian considerations. As the Court noted in *Case*,

> the fact that bondholders might fare worse as a result of a foreclosure and liquidation than they would by taking a debtor's plan under s[ection] 77(B) can have no relevant bearing on whether a proposed plan is 'fair and equitable' under that section. Submission to coercion is not the application of 'fair and equitable' standards.

*Case*, 308 U.S. at 123, 60 S.Ct. at 11. As stated in *Ahlers*:

> [T]he Code provides that a "fair and equitable" reorganization plan is one which complies with the absolute priority rule ... and the Code provides that it is up to the creditors—and not the courts—to accept or reject a reorganization plan which fails to provide them adequate protection or fails to honor the absolute priority rule.

*Ahlers*, 485 U.S. at 206–07, 108 S.Ct. at 969 (citations omitted).

For these reasons the Court finds that the Debtors have failed to prove that the contribution contemplated by the Plan is reasonably equivalent to the interest in the ELS Motels to be retained by the Reorganized Company and denies confirmation of the Plan.